UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID SNOW,

       Plaintiff,                                    Hon. Robert J. Jonker

v.                                                    Case No. 1:12-CV-455

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.
_____/

## REPORT AND RECOMMENDATION

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive. Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 34 years of age on his alleged disability onset date. (Tr. 118-19). He successfully completed high school, as well as "about two years of college," and worked previously as a panel saw operator, cook, assistant manager, store manager, and sales associate. (Tr. 19, 34, 162).

Plaintiff applied for benefits on November 20, 2008, alleging that he had been disabled since April 13, 2008, due to chronic back pain and degenerative disc disease. (Tr. 118-19, 161). Plaintiff's application was denied, after which he requested a hearing before an Administrative Law Judge (ALJ). (Tr. 61-117). On June 22, 2011, Plaintiff appeared before ALJ Donna Grit, with testimony being offered by Plaintiff and vocational expert, Michelle Korponai. (Tr. 27-59). In a written decision dated August 23, 2011, the ALJ determined that Plaintiff was not disabled. (Tr. 13-21). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 4-8). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

# RELEVANT MEDICAL HISTORY

On June 26, 2008, Plaintiff underwent surgery, performed by Dr. Jurgen Luders, to repair a bulging disc at T11-T12. (Tr. 242-43). X-rays of Plaintiff's thoracic spine taken on August 6, 2008, revealed "stable appearance of the thoracic spine." (Tr. 263).

On September 24, 2008, Plaintiff was examined by Physician's Assistant Daniel Leep. (Tr. 226). Plaintiff reported that he was "doing well" and "denie[d] significant back pain." (Tr. 226). Plaintiff also reported that "the strength in his left foot is continuing to improve," but that "his neck has been bothering him with some occasional numbness and tingling down his proximal right arm." (Tr. 226). The results of a physical examination revealed a negative Hoffmann's sign[1] with no lower extremity clonus[2] and no signs of myelopathy. (Tr. 226). Plaintiff was instructed to participate in physical therapy. (Tr. 226).

On October 22, 2008, Plaintiff reported to the emergency room complaining of "back pain." (Tr. 240). Plaintiff reported that "since [his back surgery] his pain has been doing fairly well" and "was showing improvement" with physical therapy. (Tr. 240). Plaintiff reported, however, that "over the past 48 hours, he has been having increasing pain in his back" which "does not radiate into his lower extremities as it did previous." (Tr. 240). Plaintiff reported that "he has taken approximately 12 Vicodin tablets in the past 12 hours to try to treat this pain without relief of the pain." (Tr. 240). Plaintiff exhibited "mild left upper extremity radiculopathy symptoms," but "intact

---

[1] Hoffman's sign is an indicator of a number of neurological conditions including cervical spondylitis, other forms of spinal cord compression, and multiple sclerosis. *See* Hoffman's Sign, available at, http://www.mult-sclerosis.org/Hoffmanssign.html (last visited on August 26, 2013).

[2] Clonus refers to a "series of fast involuntary [muscle] contractions" which can be caused by "an imbalance of signals from the central nervous system." *Spasticity*, available at http://www.webmd.com/pain-management/pain-management-spasticity (last visited on August 26, 2013).

sensation and reflexes." (Tr. 239). Plaintiff was provided Dilaudid and Valium after which he "was feeling much improved." (Tr. 239). Plaintiff was discharged with instructions to "discontinue this abusive pattern in the consumption of Vicodin." (Tr. 239).

On October 27, 2008, Plaintiff participated in an MRI examination of his cervical spine the results of which revealed "minor degenerative changes" with "no disc herniation, stenosis, or significant neural element impingement." (Tr. 256).

Physical therapy treatment notes dated January 15, 2009, indicate that between the dates of October 17, 2008, and November 6, 2008, Plaintiff attended three physical therapy sessions. (Tr. 299). Plaintiff was subsequently discharged from physical therapy because he "discontinued coming to therapy." (Tr. 299).

On October 13, 2009, Plaintiff completed a report concerning his daily activities. (Tr. 185-94). Plaintiff reported that he drives his wife to work and his children to school each morning after which he watches television. (Tr. 185). Plaintiff reported that he picks his wife up from work in the afternoon after which he prepares dinner. (Tr. 185). Plaintiff reported that he watches television and visits with his family in the evenings. (Tr. 185). Plaintiff reported that he vacuums, loads the dishwasher, and shops for groceries and household items. (Tr. 187-89). Plaintiff also reported that he listens to music, plays video games, uses a computer, and attends Boy Scout meetings with his sons. (Tr. 189-90).

On December 2, 2009, Plaintiff participated in a consultive examination conducted by Dr. R. Scott Lazzara. (Tr. 353-56). Plaintiff reported that he was experiencing back pain which radiated into his left lower extremity. (Tr. 353). Plaintiff reported that he was taking Darvocet and

5

Oxycontin, but was not participating in physical therapy. (Tr. 353). With respect to Plaintiff's activities, the doctor reported the following:

> He can do his activities of daily living. He states he has a hard time climbing steps and carrying laundry but is able to drive and cook. He otherwise does not do any household chores as he avoids any bending. He now mostly spends his time watching television, playing on the computer and visiting friends as well as doing college courses online. He can sit and stand about 15 minutes if he can adjust his weight. He can walk about one block. He states he is not allowed to lift anything because he cannot bend.

(Tr. 353). The results of a musculoskeletal examination revealed the following:

> There is no evidence of joint laxity, crepitance or effusion. Grip strength remains intact. Dexterity is unimpaired. [Plaintiff] could pick up a coin, button clothing, and open a door. [Plaintiff] had mild difficulty getting on and off the examination table, moderate difficulty heel and toe walking, moderate difficulty squatting, and was unable to hop.

(Tr. 354). The results of a neurological examination revealed the following:

> Cranial nerves are intact. Motor strength is reduced to 4/5 power in the left hip. Tone is normal. There is sensory loss over the anterior left thigh. Reflexes are +2 and symmetrical. Romberg testing[3] is negative. [Plaintiff] walks with a moderate left gait without the use of an assist device.

(Tr. 355).

The doctor concluded that Plaintiff was experiencing "chronic back pain." (Tr. 355). The doctor observed that Plaintiff "did have diminished range of motion of his lumbar spine" and "did have difficulty doing orthopedic maneuvers and did have diminished power in the left hip due

---

[3] Romberg test is a neurological test designed to detect poor balance. *See* Romberg Test, available at http://www.mult-sclerosis.org/RombergTest.html (last visited on August 26, 2013). The patient stands with her feet together and eyes closed. The examiner will then push her slightly to determine whether she is able to compensate and regain her posture. *Id.*

to pain." (Tr. 355). The doctor further observed that Plaintiff "does have meralgia paresthetica[4] to the left leg," but no evidence of radiculopathy. (Tr. 355). The doctor further noted that Plaintiff "would benefit from continued strengthening exercises to the left leg." (Tr. 355).

The following day, Dr. McBride completed an assessment of Plaintiff's physical capabilities. (Tr. 370-71). The doctor reported that during an 8-hour work day, Plaintiff could sit for less than one hour and stand/walk for less than one hour. (Tr. 370). The doctor reported that Plaintiff required a sit/stand option. (Tr. 370). Dr. McBride reported that Plaintiff could use his right upper extremity to perform simple grasping, pushing and pulling, and fine manipulation activities, but could not perform these activities with his left upper extremity.[5] (Tr. 370). The doctor reported that Plaintiff could occasionally lift five pounds but could never lift more than five pounds. (Tr. 371). The doctor reported that Plaintiff could occasionally climb, balance, stoop, kneel, and reach above shoulder level, but could never crawl. (Tr. 371). Dr. McBride concluded that Plaintiff's pain was so severe that it prevented him "from working full time, even in a sedentary position." (Tr. 372).

On December 3, 2010, Plaintiff was examined by Dr. Keith Javery. (Tr. 400-06). Plaintiff reported he was experiencing low back pain which he rated as 7-8 on a scale of 1 to 10. (Tr. 402). Plaintiff described his pain as "constant" and that it was "aggravated by bending, climbing stairs, lifting, sitting for long periods of time, standing for long periods of time, and walking." (Tr.

---

[4] Meralgia paresthetica refers to a condition "characterized by tingling, numbness and burning pain in the outer part of [the] thigh." *Meralgia Paresthetica*, available at http://www.mayoclinic.com/health/meralgia-paresthetica/DS00914 (last visited on August 26, 2013). This condition is commonly caused by "[t]ight clothing, obesity or weight gain" that results in "compression of the nerve that supplies sensation to the skin surface of [the] thigh." Meralgia paresthetica can, "in most cases," be relieved "with conservative measures." *Id.*

[5] Plaintiff is right hand dominant. (Tr. 192).

402). An examination of Plaintiff's cervical spine was unremarkable with a negative Spurling's test.[6] (Tr. 404). Plaintiff exhibited "moderately reduced" range of motion in his thoracic and lumbosacral spine with evidence of paraspinal muscle spasm. (Tr. 404). Straight leg raising test was negative bilaterally. (Tr. 404). The results of a neurologic examination were unremarkable. (Tr. 404-05). Dr. Javery modified Plaintiff's medication regimen and also administered an epidural steroid injection. (Tr. 405-06).

On February 14, 2011, Plaintiff was examined by Dr. Javery. (Tr. 389-99). Plaintiff reported that his "pain medications were effective" and that "he has more mobility." (Tr. 391). Plaintiff exhibited "reduced" range of motion in his lumbosacral spine and straight leg raising was negative bilaterally. (Tr. 393). The results of a neurologic examination were unremarkable. (Tr. 393). Plaintiff received another epidural steroid injection. (Tr. 393). Treatment notes dated March 29, 2011, indicate that Plaintiff's "pain is better than it was at the previous visit." (Tr. 385). Plaintiff further reported that his medications were "effective and well tolerated." (Tr. 385).

At the administrative hearing, Plaintiff testified that he can stand for 10 minutes, sit for 30 minutes, and walk "a block or two." (Tr. 44). Plaintiff reported that he was experiencing trouble "focusing and concentrating" as a result of his pain medication. (Tr. 46). Plaintiff reported that he could lift 10 pounds. (Tr. 49). Plaintiff reported that he was unable to squat, bend over and touch his toes, or rise from the floor without assistance. (Tr. 49-50).

---

[6] A positive Spurling's test suggests the presence of a cervical nerve root disorder. Thomas W. Woodward, M.D., and Thomas M. Best, M.D., Ph.D., *The Painful Shoulder: Part I Clinical Evaluation*, American Family Physician, May 15, 2000, *available at*, http://www.aafp.org/afp/20000515/3079.html (last visited August 26, 2013).

# ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[7] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528. While the burden of proof shifts to the Commissioner at step five of the sequential evaluation process, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*,

---

[7] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffered from: (1) post thoracic diskectomy and fusion; (2) chronic pain; (3) left leg meralgia paresthetica; (4) history of headaches; (5) degenerative disease of the cervical spine; (6) left shoulder pain; and (7) obesity (with weight loss), severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 15-16).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform sedentary work[8] subject to the following limitations: (1) he requires a sit/stand option and option to use a cane when walking; (2) he cannot climb ladders, ropes, or scaffolds; (3) he can perform less than frequent balancing, stooping, kneeling, and climbing of stairs/ramps; (4) no crouching or crawling; and (5) he must avoid concentrated exposure to vibration, unprotected heights, and dangerous moving machinery. (Tr. 16).

The ALJ determined that Plaintiff could not perform his past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, his limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden.

---

[8] Sedentary work involves lifting "no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567. Furthermore, while sedentary work "is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." *Id.*

*O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Michelle Korponai.

The vocational expert testified that there existed approximately 8,600 jobs in the state of Michigan which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 31, 55-58). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006). The ALJ concluded, therefore, that Plaintiff was not entitled to benefits.

    a.    The ALJ Properly Assessed the Medical Evidence

On February 1, 2010, Dr. McBride completed a form regarding Plaintiff's limitations. The doctor reported that during an 8-hour work day, Plaintiff could sit for less than one hour and stand/walk for less than one hour. The doctor reported that Plaintiff required a sit/stand option. Dr. McBride reported that Plaintiff could use his right upper extremity to perform simple grasping, pushing and pulling, and fine manipulation activities, but could not perform these activities with his left upper extremity. The doctor reported that Plaintiff could occasionally lift five pounds but could never lift more than five pounds. The doctor reported that Plaintiff could occasionally climb, balance, stoop, kneel, and reach above shoulder level, but could never crawl. Finally, the doctor

concluded that Plaintiff's pain was so severe that it prevented him "from working full time, even in a sedentary position." Plaintiff argues that because Dr. McBride was his treating physician, the ALJ was required to afford controlling weight to his opinion.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and her maladies generally possess significant insight into her medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, "give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Wilson*, 378 F.3d at 544. In articulating such reasons, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of

the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *See* 20 C.F.R. §§ 404.1527, 416.927; *see also*, *Wilson*, 378 F.3d at 544. The ALJ is not required, however, to explicitly discuss each of these factors. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007). Instead, the record must reflect that the ALJ considered those factors relevant to her assessment. *See Oldham*, 509 F.3d at 1258; *Undheim*, 214 Fed. Appx. at 450.

The ALJ accorded little weight to Dr. McBride's opinion. The ALJ observed that Dr. McBride "relied quite heavily on the subjective report of symptoms and limitations provided by [Plaintiff], and seemed to accept uncritically most of what [Plaintiff] reported." (Tr. 19). A review of the form that the doctor completed as well as the letter that accompanied such supports the ALJ's conclusion in this regard. (Tr. 377). There is no indication in either the form or the accompanying letter that Dr. McBride's opinion was based upon the results of any examination or testing. Instead, the doctor, in the letter accompanying the form report, simply reported Plaintiff's allegations of pain, accepting such without comment. (Tr. 377).

The ALJ also observed that Dr. McBride's opinion "is inconsistent with the record as a whole." A review of the medical evidence, as discussed above, amply supports the ALJ's conclusion in this regard. The medical evidence is inconsistent with Plaintiff's allegations of extreme pain and limitation. Moreover, Plaintiff's reported activities, as well as his failure to participate in physical therapy as instructed, further support the ALJ's opinion. The ALJ also discounted Dr. McBride's opinions regarding Plaintiff's mental status and capabilities as constituting opinions "outside the doctor's area of expertise." In sum, the ALJ articulated good reasons,

13

supported by substantial evidence, for affording less than controlling weight to Dr. McBride's opinions.

b.  Boilerplate Language

With respect to her assessment of Plaintiff's credibility, the ALJ concluded as follows:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual capacity assessment.

(Tr. 18).

Plaintiff asserts that he is entitled to relief because the ALJ's reliance on "meaningless boilerplate clearly demonstrates that his (sic) opinion is not supported by substantial evidence." In support of this argument, Plaintiff cites to *Bjornson v. Astrue*, 671 F.3d 640 (7th Cir. 2012), in which the Seventh Circuit criticized the use of the aforementioned language as "meaningless boilerplate." *Id.* at 645. As has been recognized, however, the shortcoming with the ALJ's decision that was at issue in *Bjornson* was that the ALJ in that case "used the boilerplate as [his] only statement about the claimant's credibility." *Johnson v. Commissioner of Social Security*, 2013 WL 1703894 at *4 (W.D. Mich., Apr. 19, 2013). On the other hand, where such boilerplate is accompanied by appropriately detailed and focused analysis, consistent with the aforementioned standard, the presence of the offending boilerplate does not constitute grounds for relief. *Id.* Here, the ALJ

discussed the evidence of record at length and detailed her rationale for discounting Plaintiff's subjective allegations. (Tr. 16-19). The Court, therefore, rejects this argument.

        c.        The ALJ Properly Relied on the Vocational Expert's Testimony

Finally, Plaintiff asserts that the ALJ relied upon the response to an inaccurate hypothetical question. While the ALJ may satisfy her burden through the use of hypothetical questions posed to a vocational expert, such hypothetical questions must accurately portray the claimant's physical and mental impairments. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996).

The hypothetical question which the ALJ posed to the vocational expert simply asked whether there existed jobs which an individual could perform consistent with Plaintiff's RFC, to which the vocational expert indicated that there existed in the state of Michigan approximately 8,600 such jobs. The ALJ's RFC determination is supported by substantial evidence and there was nothing improper or incomplete about the hypothetical questions the ALJ posed to the vocational expert. The Court concludes, therefore, that the ALJ properly relied upon the vocational expert's testimony.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, the undersigned recommends that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C).

Failure to file objections within such time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: August 29, 2013        /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge